# UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

| | | |
|---|---|---|
| United States of America<br>v.<br><br>ALEXANDER FRIEDMANN<br><br>*Defendant(s)* | ) ) ) ) ) ) ) ) | Case No. 20-mj-1071 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **January - March, 2020** in the county of **Davidson** in the **Middle** District of **Tennessee**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 922(g)(1) | Possession of a Firearm by a Convicted Felon |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Keith Sutherland, FBI TFO
*Printed name and title*

Sworn to me remotely by telephone, in compliance with Fed. R. Crim. P. 4.1.

Date: 05/26/2020

*Judge's signature*

City and state: Nashville, Tennessee

United States Magistrate Judge Barbara Holmes
*Printed name and title*

## STATEMENT IN SUPPORT OF COMPLAINT

I, Keith M. Sutherland, being duly sworn, do hereby state the following:

1. I have been in law enforcement for over twenty seven (27) years. I am currently a detective with Metropolitan Nashville Police Department (MNPD) and am currently assigned to the Federal Bureau of Investigation (FBI) WEST Tennessee Violent Crimes Task Force, and am working out of the FBI's Nashville Resident Agency, in Nashville, Tennessee (TN). I am currently deputized as a Special Federal Officer/Special Deputy United States Marshal. One of my duties is to investigate violent crimes to include, the possession of a firearm by prohibited persons; under Title 18, United States Code (USC), Section § 922(g)(1) occurring in the Middle District of Tennessee.

2. The facts contained in this complaint are based on firsthand knowledge or information learned during this investigation from other law enforcement sources or witnesses related to this investigation. The complaint does not provide each and every detail known by your affiant regarding this investigation, but rather provides information necessary to establish probable cause for the offense. Except where indicated, all statements referred to below are set forth in substance and in part, rather than verbatim.

3. Title 18, United States Code, Section § 922(g)(1) makes it an offense for any person, who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year, to be in possession of a firearm that had moved in or affected commerce.

## INTRODUCTION

4. In late 2019 and early 2020, law enforcement investigators determined that Alex FRIEDMANN had surreptitiously gained access to the Downtown Detention Center in downtown Nashville, Tennessee which was then under construction. While FRIEDMANN was inside the facility, dressed as a construction worker, he secreted a number of weapons – including firearms – inside the walls of the facility. In early 2020, law enforcement began investigation FRIEDMANN's activities and discovered a significant weapons cache that FRIEDMANN had stored in the basement of a third party. FRIEDMAN is a convicted felon and the firearms recovered have all traveled in interstate commerce.

## INITIAL DISCOVERY OF FRIEDMANN'S ACTIVITIES
## AT THE DOWNTOWN DETENTION CENTER

5. In July 2016, the Davidson County Sheriff's Office ("DCSO"), began the demolition of the Metropolitan Nashville Criminal Justice Center, located at 200 James Robertson Parkway, Nashville, Tennessee, and began construction for the Downtown Detention Center ("DDC") at the same location.

6. On November 1, 2019, the DCSO had taken over the physical security of the DDC as the facility was being prepared to be made operational in January 2020.

7. Surveillance cameras were being placed in the DDC beginning in July\August of 2019. At that time, construction-related work was being finalized at the facility, and thus construction workers and contract workers were on site finalizing the construction.

8. On December 27, 2019, employees of the DCSO were inside the DDC Key Control Room. This is a secure room inside the facility which is used, in part, to house the facility keys including the keys designed for the secure areas of the facility used to house inmates. DCSO employees determined that a security ring on one set of the "secure area" keys appeared different than the others.

9. Based on their discovery, an inventory of the facility keys was conducted by the DCSO. This inventory determined that two keys for the secure areas of the DDC facility were missing.

10. Subsequent review of internal surveillance video for the DDC Key Room, determined that an unknown male Caucasian ("UNSUB"), wearing a yellow work vest, khaki cargo pants, and a dust mask which partially covered his face, entered the key control room where the keys were last known to be. The video captured this UNSUB taking two DCSO two keys: one for general movement throughout the facility, and the other for the kitchen area.

11. As stated, the DDC was under construction, and the clothing worn by the aforementioned unknown male was consistent with the clothing worn by the construction workers and contractors employed during the construction of the DDC.

12. DCSO confirmed that the UNSUB would not have their authorization to take the two facility keys.

13. With this in mind, the DCSO began to actively "be on the lookout" for the unknown male subject depicted in the above described surveillance video. On January 4, 2020, they located the same subject, now identified as being Alexander FRIEDMANN ("FRIEDMANN") on the property.

14. At that time, FRIEDMANN was dressed in a manner consistent with the employed construction workers and contractors employed during the construction of the DDC. Specifically, FRIEDMANN was wearing a yellow reflective vest, hard hat, protective gloves, and a dust mask covering his face. He was also carrying painting supplies.

15. When questioned by the DCSO regarding why he was at the DDC, FRIEDMANN stated that he was there to work. At that time, the DCSO confirmed that FRIEDMANN was not employed by any construction company or contractor currently involved with the construction of the DDC and detained him.

16. On January 4, 2020, FRIEDMANN, upon being detained by the DCSO, and subsequent arrest by the MNPD, had with him a hand drawn schematic of a portion of the DDC, of which he attempted to destroy by chewing up and swallowing.

17. The DCSO notified the Metropolitan Nashville Police Department ("MNPD"), who responded and charged FRIEDMANN with:

    - Possession of Burglary Tools, in violation of Tennessee Code Annotated 39-14-701;
    - Burglary, in violation of Tennessee Code Annotated 39-14-402; and
    - Evidence Tampering, in violation of Tennessee Code Annotated 39-16-503(a)(1).

18. FRIEDMANN was able to make a bond and was released on the same date, January 4, 2020.

19. MNPD Central Precinct Detective Robert Anderson ("Detective Anderson") was assigned as the lead investigator to this investigation.

## REVIEW OF SURVEILLANCE FOOTAGE AND DISCOVERY
## OF HIDDEN ITEMS AT DOWNTOWN DETENTION CENTER

20. Based on this security breech, and the aforementioned two missing security keys, the DCSO began to review historic surveillance video looking specifically for FRIEDMANN.

21. DCSO employees located, on historic surveillance video, multiple insistences where an individual had entered the DDC whose physical appearance was consistent with FRIEDMANN, and who was also dressed in a manner consistent with the articles FRIEDMANN was wearing when arrested at the DDC on January 4, 2020.

22. On different occasions, the individual believed to be FRIEDMANN had an accomplice acting as a lookout for him as he was working in specific areas of the DDC.

23. With the discovery of the historic surveillance video, the DCSO began to use their surveillance cameras to follow the path of this individual as he walked throughout the DDC.

24. The DCSO identified the following dates (other than the date he was arrested) where they could observe, on the surveillance video, an individual inside the DDC whose physical appearance was consistent with FRIEDMANN, and who was dressed in a manner consistent with the way FRIEDMANN was dressed at his arrested on January 4, 2020 ("the individual" for purposes of this paragraph):

    - August 30, 2019, the individual entered the DDC Medical Unit and inspected a mirror and counted the bricks. He then exited the DDC and returns with another man, who was also dressed as a construction worker. This second man appeared to act as a lookout while the individual (believed to be FRIEDMANN) covered a camera located inside the room. Once the camera was covered, the "lookout" entered the room with the covered camera. Later, the two people uncovered the camera and headed to the visitation area where the "lookout" acted as a lookout again, as the individual other appears to caulk and paint around the visitation area windows;

- September 3, 2019, the individual entered the medical area and covered a security camera. He then appears to take a key from DCD Key Control Room, and used what appeared to be a grinder to remove material in a wall joint, he then placed an object in the wall joint and covered it up with another material;
- September 26, 2019, the individual entered the DCSO DDC, investigated a maintenance hatch, and the visitation area. He then entered the DDC key Control Room, and appeared to stuff an object into a window hatch;
- October 2, 2019, the individual appeared to dig into an expansion joint in a wall and removed material, later placing tape over the area he dug into. It also appeared that he removed caulk from around a window and placed an item inside it;
- October 4, 2019, the individual was seen patching up an area in a wall that he was previously working on. He also investigated the DCD key Control Room's windows and doors;
- October 12, 2019, the individual attempted to enter DCSO through the back dock with a visitor pass and was denied;
- October 25, 2019, the individual entered the DCSO DDC, and was confronted by a contractor about the color of his vest. He later taped folders to a door in the key control room, and then took a florescent vest that was of a different color than he was wearing and appeared to be the correct vest for the kind of work being done at that time;
- November 6, 2019, the individual appeared to hide a pry bar in a maintenance hatch and cover it with spray foam. He then entered the DCSO DDC key Control Room, where he looked in drawers, and made a note on a manila folder;
- December 26, 2019, two individuals (one of which one's physical appearance was consistent with FRIEDMANN, and also dressed in a manner consistent with FRIEDMANN when arrested at the DDC on January 4, 2020) were captured on camera walking around the DCSO DDC facility;
- December 27, 2019, the individual appeared to be stealing keys from the DCSO DDC Key Control Room;
- December 28, 2019, the individual took keys from the DCSO DDC Key Control Room and walked through the facility checking locks.

25. Based on the discovery of the aforementioned surveillance videos, the DCSO began a search of the areas captured in the surveillance.

26. This search revealed identified several imperfections within the concrete walls of the DDC, specifically in the mortar line of the concrete wall. Further examination of the mortar lines determined that the area where the mortar grout would be, was soft and not consistent with dried mortar.

27. On February 10, 2020, the MNPD Crimes Scene Unit and MNPD Central Precinct Investigations conducted a consensual search of area the DCSO had previously identified as places of interest.

28. Located in the DDC's designated visitation area on the inmate side of visitation booth #2, wrapped in plastic and covered in tape, were the following:

    - American Arms .22 Revolver (serial number has been altered);
    - Razor blade;
    - Three handcuff keys;
    - Security bit;
    - Ten .22 cartridges.

29. Located in Medical Waiting Room #2 in the mortar between the wall and door frame was a kit wrapped in plastic and covered in tape containing:

    - Two handcuff keys;
    - Razor;
    - Saw blade;
    - Security Bit.

30. Located in Detention Center Inmate Waiting Room #2 behind the bottom mirror was the following:

    - Double Tap 9mm pistol (serial number had been altered);
    - Razor blade;
    - Three handcuff keys;
    - Six 9m Luger cartridges.

31. Located in the Detention Center Medical Unit Inmate Restroom was the following:

    - Ruger LCR .38 Revolver (serial number had been altered);
    - Eleven .38 cartridges;
    - Silica Gel Pack;
    - Three Handcuff Keys;
    - Security Bit.

32. An examination of the aforementioned handguns determined that the serial numbers on each of them had been drilled through to conceal their identification.

33. Based on the aforementioned facts, MNPD Detective Anderson drafted a state search warrant to search the residence of FRIEDMANN, identified as 1004 Broadmoor Avenue, Nashville, Tennessee.

34. On February 14, 2020, the MNPD executed the state search warrant on FRIEDMANN's residence. No firearms or ammunition were located.

35. The Davidson County Grand Jury indicted FRIEDMANN for Vandalism with damage of $250,000 or more in violation of Tennessee Code Annotated § 39-14-408. This indictment was made public on February 18, 2020.

## DISCOVERY OF OTHER FIREARMS CACHE HIDDEN BY FRIEDMANN

36. The MNPD did additional research and determined that FRIEDMANN owned several condominiums in a large condominium complex located at 270 Tampa Drive, Nashville, Tennessee.

37. During the course of the investigation, MNPD Detective Anderson was contacted by an individual identified hereafter as "G.T.", who advised that, G.T.'s office had previously provided notary services for FRIEDMANN.

38. G.T. also advised MNPD Detective Anderson that it was a normal procedure for the office to photocopy what they notarized, and that, based on what they had notarized for FRIEDMANN, it was believed that FRIEDMANN had a storage building. Det. Anderson ultimately obtained a copy of these copies.

39. Of note, was a copy of a notarized letter signed by FRIEDMANN to Greg Hall, stating that in the event of his (FRIEDMANN's) untimely death, "Ferris Mar" has permission to obtain the contents to the "M Building storage area."

40. Based on this notarized letter, on March 12, 2020, MNPD Detective Anderson went to the aforementioned 270 Tampa Drive complex, specifically the "M Building" and located what was determined to be a basement area shop approximately 2,000 square feet, as well as an individual named Greg Hall ("Hall").

41. Hall agreed to be interviewed by MNPD Detective Anderson and representatives of the FBI NVRA.

42. Hall stated that he resided at 270 Tampa Drive Unit M-21. He also rented the basement area of the M Building from the condominium complex in order to use it for his home repair business. Hall estimated the size of this basement area to be around 2,000 square feet.

43. Hall has known FRIEDMANN for an extended period of time. For example, FRIEDMANN once resided in a condo at the 270 Tampa Drive complex, and both been had served on the Homeowner's Association Board of Directors at the complex.

44. In approximately 2018, FRIEDMANN asked Hall build him (FRIEDMANN) a secure, fireproof storage area within part of Hall's basement area shop in M Building (hereinafter "the shop"). Hall agreed and, at FRIEDMANN'S direction, built FRIEDMANN an approximately 200 square foot storage area using concrete blocks.

45. FRIEDMANN told Hall that he wanted the storage area to be fireproof in order to protect his legal documents. FRIEDMANN paid Hall for the material used for this construction, as well as labor for Hall to build it. Hall built the storage area in the far corner of his shop.

46. Hall stated that the storage area he constructed for FRIEDMANN is approximately 200 square feet total, but is divided into two separate rooms. Both rooms have doors which lock.

47. Hall provided FRIEDMANN a key to get into the main shop, but only FRIEDMANN had keys to his storage area. Hall never witnessed anyone place anything into the storage area that he constructed for FRIEDMANN.

48. FRIEDMANN offered to help Hall construct the storage area, but Hall declined assistance. During the construction process, Hall, at FRIEDMANN's request, showed FRIEDMANN how to use an electric grinder on concrete.

49. Hall, also as FRIEDMANN's request, showed FRIEDMANN how to drill holes in concrete, and how to cut concrete blocks.

50. Hall also allowed FRIEDMANN to use his press drill. FRIEDMANN stated to Hall that he (FRIEDMANN) was constructing a water filtration device, and was using the press drill to drill thru metal. Hall showed FRIEDMANN the proper way to drill thru metal and avoid burning the drill bit.

51. Hall stated that on February 18, 2020, he saw FRIEDMANN at the 270 Tampa Drive Complex. At that time, FRIEDMANN told Hall that he (FRIEDMANN) was there to remove items from his storage area, and take them to a permanent storage area elsewhere.

52. FRIEDMANN had obtained a U-Haul truck, which was stuck in the mud behind the "M Building." Hall stated that they could not free the U-Haul from the mud.

53. With this in mind, Hall took FRIEDMANN to a U-Haul rental facility, located at 3904 Nolensville Road, to rent a different van. They then returned to the condo complex, where Hall witnessed FRIEDMANN load several crates into the newly rented cargo van using a dolly. Hall stated that he had helped FRIEDMANN load two heavy crates.

54. Hall described the crates as being black plastic with yellow lids. Each crate was locked with several pad locks. Hall believed that there were 10 to 15 crates total, each weighing approximately 50-75 pounds.

55. During his interaction with FRIEDMANN on February 18, 2020, Hall described FRIEDMAN as acting "frantic" and "desperate."

56. Hall went back to work and when he returned later that day, FRIEDMANN was waiting for him at his (Hall's) condo.

57. FRIEDMANN asked Hall to take him back to the U-Haul in Madison, Tennessee, located at 121 Moving Center Drive, to obtain his personal vehicle. Hall agreed. Hall described FRIEDMANN as looking tired, worn out and exhausted when he saw him.

58. During this time, FRIEDMANN told Hall that he was probably going to get arrested again, and that he was putting his affairs in order. FRIEDMANN gave Hall the keys to the storage area, and told him everything was out of it. Hall took this action to mean that FRIEDMANN was releasing to Hall whatever interest he (FRIEDMANN) had in the portion of Hall's basement shop that had previously been sectioned off.

59. MNPD Detective Anderson obtained a state search warrant to search FRIEDMANN'S storage area, located in the shop under the "M Building" at 270 Tampa Drive.

60. MNPD Detective Anderson executed this search warrant on March 13, 2020. Representatives of the FBI NVRA, and the MNPD Crime Scene Unit were also present.

61. Hall provided the keys to the storage area that FRIEDMANN had previously given him (Hall) on February 18, 2020.

62. During the search warrant, investigators noticed obvious inconsistencies in the mortar joints between the concrete blocks at or near waist level on the interior side of the wall for room #1. These inconsistencies were similar to those located in the DDC where the various packs of razor blades, handcuff keys and security bits had been secreted (as previously described in Paragraph 25).

63. Investigators noted that the mortar between the blocks was visually different, and had been repainted over. It appeared that someone had removed the original mortar, and replaced it with a concrete mixture. In the same area on the wall, investigators noted that a different section of the mortar appeared softer, as though the original mortar had been removed and replaced with a rubber caulk.

64. Hall confirmed that these inconsistencies were not present when he had originally constructed the storage area for FRIEDMANN.

65. Investigators recognized the aforementioned inconsistencies as potentially being practice attempts by FRIEDMANN to cut into the mortar in the same way the mortar was cut into at the DDC.

66. MNPD Detective Anderson queried the name "Farris Mar" against a database of Tennessee driver's license information, and located one matching name. This name was Ferris Marone (hereinafter "Ferris"), and located an address listed on his Tennessee Driver License. This address is 7862 Whites Creek Pike, Joelton, Tennessee. This address is located within Nashville, Davidson County, Tennessee.

67. On March 20, 2020, MNPD Detective Anderson went to 7862 Whites Creek Pike with the intent to speak with Ferris. There was no response at the door; however MNPD Detective Anderson was able to reach Ferris telephonically.

68. Ferris advised MNPD Detective Anderson that he did not reside at the 7862 Whites Creek Pike address at that time. He stated that he had moved out in the last few months pending a divorce from his wife, April Marone (hereinafter "April"). At the time Det. Anderson spoke to Ferris, only April resided at the 7862 Whites Creek Pike.

69. MNPD Detective Anderson was able to speak with April telephonically, who confirmed that she knew FRIEDMANN. Furthermore, April told investigators that she agreed to allow FRIEDMANN to store what he (FRIEDMANN) described to her were "legal documents" at her residence at 7862 Whites Creek Pike.

70. During this telephonic conversation, April told MNPD Detective Anderson that she saw several crates, which she described as black with yellow tops, in her basement storage area covered by a tarp. April believed that this was what FRIEDMANN had previously described to her as the "legal documents" she had allowed him to store at her home.

71. April provided MNPD Detective Anderson with her consent to search her residence, and provided MNPD Detective Anderson with the code to her side door. However, MNPD Detective Anderson also obtained a state search warrant for 7862 Whites Creek Pike on March 20, 2020.

72. After obtaining the search warrant for 7862 Whites Creek Pike, MNPD Detective Anderson executed the search warrant the same date. During this search, MNPD Detective Anderson located several black crates with yellow tops in April's garage storage area.

73. Based on this, MNPD Detective Anderson obtained another state search warrant for items recovered from 7862 Whites Creek Pike, and with the assistance of MNPD Crime Scene Units, took possession of all of the aforementioned crates located in the basement storage area.

74. Prior to transporting the aforementioned crates, each was cut open by the MNPD for officer safety reasons.

75. Located in the crates, were firearms, law enforcement equipment, and ammunition. Some of the firearms recovered include:

- Keltec 9mm pistol;
- Keltec G 17/22 pistol;
- Keltec .22 pistol;
- Kivaari .338 Lupa pistol;
- Glock 19 9mm pistol;
- Glock 9mm pistol;
- Glock 23 .40 pistol;

- Glock 26 9mm pistol;
- Glock 27 pistol;
- Two (2) Ruger 22/45 pistols;
- North American Arms Derringer .22 pistol;
- Henry .22 pistol;
- Smith and Wesson MP .38 pistol;
- KAOS 37mm launcher (shooting flare, gas, or smoke rounds);
- Mossburg Shotgun Model 9200;
- Keltec shotgun;
- Anderson Lower Receiver bearing serial 16414398;
- Three (3) Galil ACE SAR 7.62x39 assault rifles;
- Nemesis Vanquish rifle;
- An AK-47 style assault rifle;
- Romary 7.62 assault rifle.

76. The MNPD Crime Scene Unit took possession of the crates, and they were transported to the MNPD Identification Unit for further cataloging and examination.

77. On March 23, 2020, April was interviewed in person by MNPD Detective Anderson and representatives from the FBI.

78. April confirmed that she was a longtime friend of FRIEDMANN. As well, she stated that on or about February 17, 2020, FRIEDMANN and his wife came to her residence.

79. During this visit, the parties would transition from the upstairs of the residence, to the garage so April could smoke. At some point, April wanted to go back to the garage to smoke, and only FRIEDMANN accompanied her to the garage. FRIEDMANN'S wife remained upstairs.

80. At that time, FRIEDMANN, without his wife present, asked April if he could store some "legal documents" at her residence. April agreed, advising FRIEDMANN that she was leaving to go out of town for work on February 18, 2020, and would return later in the week.

81. FRIEDMANN told April that he wanted to move the "legal documents" soon, and April therefore agreed to let him bring the "legal documents" while she was away, and provided FRIEDMANN a code to enter the garage to her residence.

82. April was not present when FRIEDMANN brought the crates to her residence.

83. April confirmed that she had several cameras at her residence, interior and exterior, and was able to remotely access surveillance video for February 18, 2020, which she allowed the interviewing agents to view in its entirety. This is the same day that Greg Hall observed FRIEDMANN moving the black crates with yellow lids from the storage area in the M Building at 270 Tampa Drive (as described above in Paragraphs 50-57).

84. There was only one surveillance camera working on February 18, 2020, the working camera is located inside April's garage, facing the garage doors. The view of this surveillance camera captures those in the garage and part of the driveway.

85. This surveillance camera is motion activated, and the video is, therefore, recorded in short blocks. On the surveillance camera footage for February 18, 2020, a male who appears to be FRIEDMANN entered April's garage via the entry door, opened the garage door, and then opened the door of what appears to be a U-Haul Van. The man who appears to be FRIEDMANN then unloaded the crates, some of which can be seen on the video to be black with yellow lids.

86. On March 12, 2020, representatives with the FBI went to the U-Haul, located at 3904 Nolensville Road, Nashville, Tennessee, and confirmed with management that they rented a U-Haul van, Arizona License Plate AJ58975, to an "Alexander Friedmann" on February 18, 2020, at or near 1:53 P.M. CST which was returned the same date at approximately 6:42 PM CST.

87. On March 26, 2020, representatives with the FBI went to the U-Haul, located at 121 Moving Center Court, Madison, Tennessee. This is the location that Greg Hall described that FRIEDMANN needed a ride to in order to pick up his personal vehicle on February 18, 2020 (as described in above Paragraph 56). Investigators confirmed with management that an individual named "Alexander Friedmann" had rented a U-Haul van, Arizona license plate AJ54048, on February 18, 2020, at or near 10:54 A.M. CST. The van was not returned until February 20, 2020, at or near 10:39 A.M. CST. This appears to be the U-Haul van that Greg Hall observed to be stuck in the mud at 270 Tampa Drive on February 18, 2020 (as described above in Paragraph 51).

88. The U-Haul rental facility, located at 121 Moving Center Court, Madison, Tennessee, captured a digital copy of FRIEDMANN'S Tennessee driver's license at the time of this transaction which investigators reviewed as part of this investigation.

89. Representatives of the FBI were able to view surveillance videos relating to the February 18, 2020, rental of the U-Haul, Arizona license plate AJ54048, from the U-Haul facility in Madison, Tennessee and noticed an individual walk from off screen towards the U-Haul main door at timestamp 11:09 A.M.

90. This individual resembles FRIEDMANN in stature, and was wearing a facial dust mask consistent with what was being worn by the unknown male as captured on the DDC surveillance videos.

## CONCLUSION

91. FRIEDMANN has the following felony convictions:

- Davidson County (Tennessee) Criminal Court Case No.: 88-W-763 (Count 1); Armed Robbery; conviction date: July 24, 1989, he was sentenced the same date to 10 years' incarceration.
- Davidson County (Tennessee) Criminal Court Case No.: 88-W-763 (Count 2); Assault with the Intent to Commit First Degree Murder; conviction date: July 24, 1989, he was sentenced the same date to 10 years' incarceration.
- Davidson County (Tennessee) Criminal Court Case No.: 91-D-1743; Attempted Aggravated Robbery; conviction date: October 8, 1992, he was sentenced the same date to 9 years' incarceration.

92. An FBI firearm nexus analyst has reviewed the firearms described in Paragraph 74 of this complaint and has determined that all of those firearms described have previously traveled in and, therefore, affected interstate commerce.

93. Based on the foregoing, I submit that there is probable cause to believe that FRIEDMANN has knowingly been convicted of a crime involving punishment greater than one year, possessed a firearm that had travelled in or affected interstate commerce in violation of Title 18, United States Code, Section § 922(g)(1).